IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA__

| | |
|---|---|
| GARY LATUSZEWSKI, JAMES ROGAN ) and REED BIGHAM, ) Plaintiffs, ) ) v. ) ) VALIC FINANCIAL ADVISORS, INC., ) Defendant ) ) ) and ) ) ) VALIC FINANCIAL ADVISORS, INC. ) and THE VARIABLE ANNUITY LIFE ) INSURANCE COMPANY, ) Counterclaim Plaintiffs, ) ) v. ) ) GARY LATUSZEWSKI, JAMES ROGAN ) and REED BIGHAM, ) Counterclaim Defendants ) ) | Civil Action No. 03-0540 |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

A.   Introduction

This action was originally filed in state court seeking a
declaration of rights under employment contracts between
plaintiffs, Gary Latuszewski, James Rogan, and Reed Bigham ("The
Employees"), and defendant VALIC Financial Advisors, Inc.  The
employment contracts included a non-compete covenant, as well as
trade secret and confidentiality provisions.  After removing the
declaratory judgment action to this court, VALIC Financial, and a
related company, the Variable Annuity Life Insurance Company,

filed numerous state law counterclaims against each of The Employees, as well as a breach of contract counterclaim under the same employment contracts. VALIC sought a preliminary injunction.

The district court found that the employment contracts were unenforceable due to a lack of consideration, but issued a preliminary injunction enjoining The Employees' misappropriation of trade secrets. Both parties appealed. The Court of Appeals for the Third Circuit reversed in part, and affirmed in part. While finding that "the District Court properly held that the information described in the preliminary injunction constituted protectable trade secrets," the court of appeals concluded that "the record does not support the preliminary injunction to the extent that [it] can be read to foreclose [The Employees] from servicing former clients of VALIC who have become [The Employees'] clients without being solicited by them using information currently supplied by those clients." The court of appeals did not rule on the enforceability of the employment contracts.

A bench trial began on November 13, 2007 and ended on November 21, 2007. Prior to the trial, both parties submitted extensive proposed findings of fact and conclusions of law. The

court has considered the evidence and the submissions of the parties and is prepared to set forth its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rule of Civil Procedure, and render its judgment.

B.   Findings of Fact

   (a)   General Background Facts

   1.   Valic Financial Advisors, Inc. is a broker-dealer headquartered in Houston, Texas.  Its representatives sell investment products, including products offered and serviced by the Variable Annuity Life Insurance Company ("VALIC").

   2.   VALIC is a life insurance company also headquartered in Houston, Texas.  VALIC sells and services annuity contracts that are used for retirement programs sponsored by schools, hospitals, governmental entities, and other non-profit organizations.

   3.   Although VALIC and Valic Financial Advisors, Inc. are two different entities, for purposes of this case they can be referred to collectively as VALIC.

   4.   Annuity products become profitable only after they have been held by a customer for several years.  Therefore, the maintenance of long-term relationships with customers is vital to the success of VALIC's business.

5. VALIC's agents, called financial advisors, market and sell the annuity contracts, and other products and services, to customers within their assigned territory.

6. A supervisor typically assigns territories to the financial advisors.

7. An assigned territory is a group of geographically related schools, hospitals, or governmental units. For instance, Mr. Latuszewski's territory prior to his resignation was Duquesne University, LaRoche College, Sisters of the Divine Providence, and the Blood Bank.

8. Territories are exclusive, meaning that only one financial advisor is assigned to any one group, giving that advisor the exclusive right to develop business on behalf of VALIC within that group.

9. Prior to their resignations, The Employees were financial advisors in VALIC's Pittsburgh office.

10. Each Employee was assigned a territory, with an existing customer base, when he started working with VALIC.

11. Gary Latuszewski began his professional affiliation with VALIC in 1987.

12. James Rogan began his professional affiliation with VALIC in 1990.

13. Reed Bigham began his professional affiliation with VALIC in 1997.

14. The three plaintiffs are referred to herein collectively as The Employees.  Where they must be discussed individually, they are referred to by their last name.

(b)  <u>The Employees' Relationship With VALIC</u>

15. Each Employee signed a contract when he began his association with VALIC, and continued to sign updated contracts throughout the relationship.  All of these contracts contained non-compete covenants and trade secret provisions.

(i)  <u>Employment Contracts - Non-Compete Covenants</u>

16. When Latuszewski and Rogan joined VALIC, they signed a contract prohibiting them from diverting business to another financial services organization during the term of their employment.

17. In 1993, Latuszewski and Rogan both signed a contract that included, for the first time, prohibitions against inducing customers to end their relationship with VALIC and providing services to former customers after leaving VALIC's employ.  The 1993 contract also

included a provision relating to trade secrets and other proprietary information.

18. Latuszewski and Rogan both signed contracts with similar restrictions in 1998.

19. Bigham signed a contract containing such restrictions when he joined VALIC in 1997.

20. In 2000, VALIC offered their financial advisors the opportunity to become employees. Previously, The Employees were not technically employees of VALIC, but had been independent contractors.

21. Latuszewski, Rogan, and Bigham applied for employment, and were offered positions.

22. In order to become employees, each was required to sign a Registered Representative Agreement (the "2001 Agreement").

23. The 2001 Agreement again included the prohibitions against inducing customers to end their relationship with VALIC and providing services to former VALIC customers.

24. The 2001 Agreement also prohibited inducing other employees to end their employment with VALIC.

25. Instead of including provisions relating to trade secrets and other proprietary information, however, the 2001 Agreement incorporated by reference a business

policy that dealt with these matters.

26. About a year later, when American International Group, Inc. acquired VALIC, a new Registered Representative Agreement was needed to reflect the change in ownership.

27. This 2002 Agreement was forwarded to all the financial advisors as an attachment to an e-mail message that explained some key features of the new Agreement. The message stated that the new Agreement still contained a non-compete covenant, but described some differences in its scope. These differences included, among other things, that the number of companies with which an employee could not compete was reduced, and that an employee could now induce other employees to end their relationship with VALIC.

28. All financial advisors were given more than three weeks to read, consider, and consult with third parties regarding the 2002 Agreement before returning a signed copy to management.

29. The advisors were explicitly invited to raise any questions regarding the Agreement with their Regional Vice President.

30. In order to continue their employment, however, all financial advisors were required to sign the 2002

Agreement.

31. Each of The Employees signed the 2002 Agreement, without reading it, without raising questions about it, and without consulting with any other person regarding its contents.

32. The 2002 Agreement contained the following statement:

> I acknowledge, represent and agree that I have reviewed all the terms of this Registered Representative Agreement, including, but not limited to the provisions relating to my Non-Competition, Non-Solicitation and Proprietary Information obligations and the Computer Schedule; that I have not modified, deleted, or added to any of the terms and conditions of the Registered Representative Agreement as presented to me by Broker-Dealer; and that I agree to be legally bound to all the terms and conditions in this Registered Representative Agreement.

33. The non-compete covenant in the 2002 Agreement read as follows:

> During the term of this Agreement and for a period of one (1) year after its termination, Registered Representative will not directly or indirectly induce or attempt to induce any Protected Customer to either (a) end or alter his or her relationship with Broker-Dealer or Protected Companies, or (b) accept business relating to competing products or services from any Protected Customer, except in the performance of his or her regular duties as a Registered Representative of Broker-Dealer.

34. These restrictions were similar in all relevant respects to those found in the 1993, 1998, and 2001 contracts that The Employees had previously signed.

35. VALIC, acknowledging the drafting error in their own contract, abandoned enforcement of subsection b of the non-compete covenant during trial. Subsection b places a blanket prohibition on accepting any business from former customers for one year after termination of the employment relationship.

36. The non-compete covenant in the 2002 Agreement, therefore, provides only that the former employee "will not directly or indirectly induce or attempt to induce any Protected Customer to [] end or alter his or her relationship with Broker-Dealer or Protected Companies."

37. To induce is to lead or move someone toward a course of action by influence or persuasion. dictionary.com, dictionary.cambridge.com, Merriam-Webster On-line (m-w.com)._____

38. Inducement does not require that force, pressure, or hard sales tactics be used, or that promises or guarantees be made, in order to obtain the desired course of action.

39. VALIC received no additional competitive restrictions from its employees when they signed the 2002 Agreement. Rather, the non-compete covenant in the 2002 Agreement was less burdensome on the employee than the non-compete covenant in the 2001 Agreement. For instance, the 2002 Agreement: (1) reduced the number of protected companies with which the

employees could not compete; and (2) removed the prohibition against inducing fellow employees to leave VALIC's employ.

40.    In addition to reducing the extent to which an employee was restricted, the 2002 Agreement also provided employees with several other benefits.  These benefits included: (1) the ability to file suit under the Agreement in a jurisdiction other than Harris County, Texas; (2) the removal of a provision requiring the employee to pay the company's attorneys fees in the event judgment was entered against the employee in a matter involving enforcement of the 2002 Agreement; and (3) the addition of the right of the employee to request an arbitration action under the agreement, which option was previously only available to the company.

(ii) Employment Contracts - Trade Secrets

41.    The 2002 Agreement also contained several provisions relating to trade secrets, and other confidential and proprietary information.

42.    One provision acknowledged that sensitive business information would be shared with The Employees:

> During the term of this Agreement, Registered
> Representative will have access to and become
> familiar with certain trade secrets and other
> confidential, proprietary information that
> belongs to Broker-Dealer and Protected
> Companies and that is or may be used in the

10

conduct of Broker-Dealer's business or the
business of Protected Companies.

43. The Employees promised not to use or disclose VALIC's trade

secrets other than for purposes of their work for VALIC:

> Registered Representative shall not, during
> the term of this Agreement, or at any time
> after its termination, disclose or use,
> directly or indirectly, any Trade Secrets of
> Broker-Dealer or Protected Companies,
> including but not limited to, customer
> identities and account information, except as
> required in the regular course of [his]
> business with Broker-Dealer or Protected
> Companies.

44. The Employees also promised not to use or disclose any other

confidential or proprietary information for a period of two

years after leaving VALIC's employ:

> Registered Representative shall not, during the
> term of this Agreement and for a period of two
> (2) years following its termination, disclose
> or use any such Other Confidential or
> Proprietary Information, directly or
> indirectly, except in the regular course of
> [his] business with Broker-Dealer or Protected
> Companies.

45. VALIC maintains a substantial amount of information about

each of its customers on its computer system.  Some

financial advisors also chose to maintain paper files on

their assigned customers.  This customer information

includes contact information, account balance amounts,

contribution history, investment strategy and preferences,

account status (active, suspended, flowing, penalties upon

transfer, etc.), and contact history with customer service,

among other things.

46. The computerized data is stored on VALIC's computer system and is accessible to VALIC's financial advisors through programs such as AgileNet, 4Sight, and AdvisorNet.

47. Advisors must use a series of passwords in order to obtain access to this information.

48. The computerized information on one financial advisor's customers is not generally available to other advisors or office staff.

49. In addition to the customer information on VALIC's computer system and in a financial advisor's paper files, financial advisors also maintain a significant amount of customer information in their minds.

50. Each of The Employees relied on this customer information in servicing customers while employed by VALIC.

51. This customer information, in whatever form, is not generally known outside of VALIC's business.

52. This customer information, in whatever form, would not be shared with a competitor.

53. Such customer information would be of significant value to a competitor.

54. VALIC has spent millions of dollars to assemble and maintain this customer information.

55. VALIC has employees dedicated to the maintenance, security,

and support of its computer systems and data.

56. It would be very difficult, time consuming, and expensive, for a competitor to attempt to recreate this customer information using only publicly available contact information.

57. The Court of Appeals for the Third Circuit agreed with the District Court that "[t]he identity of plaintiffs' customers and key information regarding those customers, including account balances, investment preferences, which customers were still contributing to their accounts, i.e. flowing, and whether they could transfer investments without penalty" were protectable trade secrets.

(iii) Pre-Departure Activities

(a) Latuszewski

58. Latuszewski gave notice of his resignation on January 7, 2003. He continued to be employed by VALIC until February 2, 2003.

59. In January of 2002, before resigning, Latuszewski, and Greg Jacobs, formed a new entity called North Atlantic Asset Management, which would provide financial and retirement planning services.

60. Before resigning, Latuszewski talked with Greg Jacobs about how much business he planned to bring to North Atlantic.

Latuszewski estimated that he could bring 20 to 25 customers with him, representing $4 million in assets under management.

61. In the week prior to giving notice of his resignation, Latuszewski spent five hours compiling and printing detailed reports about his customers from VALIC's computer systems.

62. He took at least some of these reports with him when he left.

63. At least some of the customers included in the reports ultimately transferred their assets to North Atlantic.

64. Before leaving, Latuszewski also asked Denise Alfieri, his supervisor's administrative assistant, to come to work for him at North Atlantic. She accepted the offer.

65. Thereafter Alfieri[1] sent information on more than 1,000 of Latuszewski's customers from VALIC's computer system to her home computer. She later loaded the data onto her North Atlantic computer.

66. Alfieri also assisted Latuszewski in preparing for his departure by forwarding e-mails from his work e-mail account to her personal e-mail account.

67. Prior to his departure, Latuszewski reviewed his paper

---

[1]    We have not considered the proffer of Ms. Alfieri in making any of these findings. The Employees' objection to the admission of her proffer is, therefore, moot.

files and selected the files that he would take with him when he left.  He chose files for customers who were not contributing to their accounts, or flowing, and who had individual IRA's or brokerage accounts.  These types of accounts could be moved to a new investment company with no penalty.

68. Latuszewski removed the selected files from VALIC's offices on Saturday, February 1, 2003.  That same day he left his final resignation letter on his supervisor's desk, to be effective Sunday, February 2, 2003.

69. While still employed by VALIC, Latuszewski met with numerous customers who ultimately transferred their assets to North Atlantic.  He informed them, personally, that he was forming a new financial services company, and offered them the opportunity to move their accounts to his new company.  He told at least one customer that she was one of a select group of customers who was being invited to join him at his new company.

(b)  Rogan

70. Rogan resigned on February 14, 2003.

71. Rogan met with Latuszewski and Jacobs on January 30, 2003 to discuss joining them at North Atlantic.

72. Rogan submitted an application to become affiliated with

North Atlantic on February 7, 2003.

73. In late January and early February, Rogan ran computer searches and collected customer statements on customers with account balances in excess of $50,000, customers with mutual fund accounts, and groups and individuals not assigned to him.

74. After submitting his resignation, but while still employed by VALIC, Rogan forwarded a document regarding one of the customers that ultimately transferred her assets to North Atlantic to his already activated North Atlantic e-mail address.

75. While still employed by VALIC, Rogan evaluated his book of business to determine which customers could move their assets to North Atlantic without penalty, and put together a mental list of customers to target for transfer.

76. After submitting his resignation, but while still employed by VALIC, Rogan told Latuszewski and Jacobs that he would be bringing between $2.5 and $3 million in assets under management to North Atlantic.


(c) Bigham

77. Bigham resigned on February 27, 2003.  His last day of work with VALIC was March 14, 2003.

78. Following up on discussions earlier in the month, Bigham

16

contacted Latuszewski on February 12, 2003 to ask what forms he needed to fill out to start the process of coming to work with him.

79. During his two week notice period, Bigham met with several of his customers to notify them that he was joining a new financial services firm.

80. Bigham reported back to Latuszewski when a customer was "on board", or when a meeting "went well."

81. While still employed by VALIC, Bigham informed Latuszewski and Jacobs that he would be moving approximately $1 million in assets under management to North Atlantic.

82. Bigham did not return the customer files that he maintained at his home when he resigned.  More than half of these files were for customers who ultimately transferred their assets to North Atlantic.

(c)   The Employees' New Business Venture

83. While still employed by VALIC, The Employees formulated a plan to move approximately $8 million in assets under management to North Atlantic.

84. While still employed by VALIC, The Employees, using VALIC's trade secrets (in whatever form) and time, determined which customers could move their assets without penalty, and targeted them for transfer.

85. While still employed by VALIC, each plaintiff, using VALIC's trade secrets (in whatever form) and time, collected data on a pre-selected and specifically targeted group of customers who likely would, and also could, move their assets to North Atlantic.

86. While still employed by VALIC, using VALIC's trade secrets (in whatever form) and time, Latuszewski and Bigham had meetings with targeted customers to personally invite them to move their assets to The Employees' new financial planning company.

87. Rogan contacted the target list of customers that he created while still employed by VALIC after he left VALIC's employ.

88. After their departure, The Employees had additional meetings to execute the transfer of assets that they had planned for while still employed by VALIC.

89. These pre and post departure meetings constitute inducing, or attempting to induce, VALIC's customers to move their assets to North Atlantic.

90. When they left, The Employees took customer information, in electronic, paper, and mental form with them.

91. The customer information that was taken had some correlation to the customers who ultimately moved their

assets to North Atlantic.

92. The value in the information and files that The
Employees assembled prior to their departure and took
with them was the ability to target those customers who
had both more than insubstantial balances and the
ability to move their money to North Atlantic without
penalty.

93. The Employees used the trade secret information that
they took from VALIC for the benefit of North Atlantic,
both before they left VALIC's employ, and after.

94. A competitor who did not have this trade secret
information could not know which customers to target in
order to transfer the significant amount of assets that
The Employees transferred so quickly and effortlessly.

95. The transfer of assets was not random, as would be
expected to occur naturally upon an employee's
departure.  Rather, the transfer of assets was
calculated and swift, targeting select customers, and
occurring with speed, and a high success rate.

96. For instance, every one of the ten former customers
that Rogan contacted once he got to North Atlantic
agreed to transfer his assets.

97. Likewise, of the 19 customer files that Bigham kept
after leaving VALIC, 11 of those customers agreed to

transfer their assets to North Atlantic.

98.  Using the files and electronic data taken, as well as
     the wealth of customer information in their memories,
     The Employees transferred more than $8 million in
     assets held by VALIC's former customers to North
     Atlantic in the first month after each had left VALIC.
     In the three months after they had left, the total
     assets transferred rose to more than $10 million.

99.  At no time prior to their departure had any competitor
     moved anywhere near that amount of assets from their
     territories.  Rather, on average, in the two years
     prior to their departure, less than $250,000 was
     transferred out of each of The Employees' territories
     during an entire calendar year.  Thus, in three months,
     The Employees succeeding in transferring more than ten
     times the amount of assets typically transferred in
     those territories during an entire year.

100. The transfers were of accounts whose average balance
     exceeded the average balance of all accounts assigned
     to each plaintiff while employed by VALIC.

101. The transfers were of some of the largest account
     holders assigned to each plaintiff.  For instance,
     Latuszewski moved 6 of his 8 largest accounts.  Rogan
     and Bigham each moved 2 of their 3 largest accounts.

(d)  <u>The Lawsuit</u>

102. On March 26, 2003, The Employees filed a declaratory
     judgment action in the Court of Common Pleas of
     Allegheny County seeking a ruling that the non-compete
     covenants in their employment contracts were
     unenforceable and that The Employees did not possess
     trade secrets.

103. VALIC removed the case to this court, and asserted
     state law counterclaims, in addition to breach of
     contract claims based on the employment contracts.

104. VALIC requested a preliminary injunction to enforce the
     non-compete covenant and to stop The Employees'
     misappropriation of trade secrets.

105. During the preliminary injunction hearing, The
     Employees agreed to a standstill order under which they
     were prohibited from soliciting or accepting business
     from any person who was a customer of VALIC within
     their assigned territories during the one year prior to
     their termination.  This order was in effect from July
     9, 2003 until January 6, 2004, when the preliminary
     injunction order was entered.

106. In the preliminary injunction order, the court found
     that the non-compete covenant in the 2002 Agreement was
     unenforceable because it was not supported by new

consideration.

107. However, the court enjoined The Employees from:

> (1) directly or indirectly using,
> disclosing or transmitting (I) information
> contained in [VALIC's records], including
> clients' names, addresses, account
> balances, account activity, financial
> objectives and requirements, and other
> account information of... VALIC clients;
> (ii) ...VALIC's marketing plans or other
> business information; and  (iii) other
> confidential information, trade secrets and
> commercially sensitive materials of
> ...VALIC; and
> (2) directly or indirectly engaging in any
> conduct that would result in the probable
> use of..VALIC trade secret, confidential
> and proprietary information, including
> contacting or otherwise communicating with
> any past or present...VALIC customers
> within their assigned territories in the
> year before their termination, for purposes
> of servicing and soliciting their annuity,
> mutual fund, and retirement product
> business.

108. The preliminary injunction order required VALIC to post
    an injunction bond in the amount of $500,000.  VALIC
    posted the bond January 12, 2004.

109. Both parties appealed from the preliminary injunction
    order.

110. The court of appeals agreed that VALIC's customer
    information was a trade secret, and that The Employees
    should have been enjoined from using it.

111. However, the court of appeals vacated the preliminary
    injunction order for the sole reason that "the record

does not support the preliminary injunction to the extent that either paragraph (1) or (2) can be read to foreclose [The Employees] from servicing former clients of VALIC who have become [The Employees'] clients without being solicited by them using information currently supplied by those clients." In other words, the court of appeals found that the injunction might have enjoined The Employees from doing something that they had the right to do, *i.e.*, service former customers who approached The Employees unilaterally for services and who provided The Employees with the financial records that they would need in order to service the account.

112. The court of appeals did not reach the issue of whether new consideration supported the non-compete in the 2002 Agreement.

C. Conclusions of Law

(a) Summary

113. The Employees filed a declaratory judgment action seeking a ruling that the non-compete and trade secret provisions of the 2002 Agreement were void and unenforceable.

114. VALIC brought claims for breach of these same

contractual provisions, as well as for misappropriation of trade secrets, breach of loyalty, and tortious interference with contract.

115. At trial, The Employees claimed that they were wrongfully enjoined by the standstill agreement and preliminary injunction.  They seek damages under the injunction bond, in excess of the face amount of the bond on the ground that VALIC sought the preliminary injunction in bad faith.

116. For the reasons that follow, we will award damages to VALIC on their counterclaims in the aggregate amount of $581,960.00.

117. We find that The Employees are entitled to no payment under the injunction bond.

118. Pennsylvania law applies to this action for the reasons set forth in this court's preliminary injunction opinion.


(b)   Breach of Contract

119. The elements of a breach of contract claim are: (1) the existence of a valid contract; (2) a breach of a duty imposed by the contract; and (3) resultant damages. J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc., 792 A.2d 1269, 1272 (Pa. Super. 2002); Gorski v. Smith, 812

A.2d 683, 692 (Pa. Super. 2002).

### (i)  Validity of the 2002 Agreement

#### (a)  Consideration

120. The 2002 Agreement is a valid contract.

121. It is a general rule under Pennsylvania law that when a non-compete covenant is executed after an employment relationship has begun, additional consideration is required to support the covenant.  George W. Kistler, Inc. v. O'Brien, 347 A.2d 311, 316 (Pa. 1975) (citing Maintenance Specialties, Inc. v. Gottus, 314 A.2d 279 (Pa. 1974)).

122. In finding the 2002 Agreement to be a valid contract, we reject The Employees' assertion that the non-compete covenant is unenforceable because it was not supported by new consideration.

123. Although the court found in its preliminary injunction opinion that the 2002 Agreement was not supported by new consideration, upon full trial on the merits, we reach the opposite conclusion.

124. The Court of Appeals for the Third Circuit did not rule on this issue.  Rather, it found the question of consideration to be moot, and, accordingly, refused to "hazard [a] prediction on how the Supreme Court of

Pennsylvania would rule on the enforceability of a non-compete covenant in the situation here presented..."

125. We find that new consideration for the non-compete in the 2002 Agreement is provided in one of two ways.

    a.   First, we find that the Uniform Written Obligations Act provides the required new consideration.

    b.   Second, we find that the benefits inuring to the employees when they signed the 2002 Agreement provide the required new consideration.

    (1)  <u>Consideration - Uniform Written Obligations Act</u>

126. The Uniform Written Obligations Act provides the required consideration for the non-compete in the 2002 Agreement.

127. Under the Uniform Written Obligations Act a written agreement may not be avoided for lack of consideration if it contains language expressing the intent of the parties to be legally bound by an agreement. 33 Pa. Cons. Stat. Ann. § 6. The statement of intent of the parties to be legally bound acts as a valid substitute for consideration.

128. We find that the Uniform Written Obligations Act applies to the 2002 Agreement.

129. The Uniform Written Obligations Act does not exempt employment contracts, or more specifically, non-compete covenants, from its coverage.

130. Our research reveals that the Pennsylvania Supreme Court has never ruled that the Uniform Written Obligations Act does not apply to employment contracts, or more specifically, non-compete covenants.

131. Our research reveals that no other appellate court in Pennsylvania has ever ruled that the Uniform Written Obligations Act does not apply to employment contracts, or more specifically, non-compete covenants. See McGuire v. Schneider, Inc., 534 A.2d 115, 118 (Pa. Super. 1987) (applying the Uniform Written Obligations Act to an employment contract).

132. The Court of Appeals for the Third Circuit has never issued an opinion ruling that the Uniform Written Obligations Act does not apply to employment contracts, or more specifically, non-compete covenants. See Harsco Corp. v. Zlotnicki, 779 F.2d 906, 911 n.2 (3d Cir. 1985) (stating, but failing to reach, the issue of whether the particular language used in an employment contract containing a non-compete covenant satisfied the requirements of the Act); but see Young Brothers, Inc. v. Hatch, 1990 WL 18903 (E.D. Pa. Feb. 27, 1990)

(although the district court refers to an order from the court of appeals stating that neither a seal, nor the Uniform Written Obligations Act, supplied the consideration necessary to give a non-compete covenant validity in the case, no published opinion issued from the court of appeals, and the district court gives no further explanation of the court of appeals's reasoning).

133. The statement in the 2002 Agreement that an employee "agree[s] to be legally bound to all the terms and conditions in this Registered Representative Agreement" satisfies the requirements of the Act and qualifies as an expression of intent to be legally bound.

134. The statement of intent to be legally bound acts as a substitute for consideration, fulfilling the requirement under Pennsylvania law that non-compete covenants added after the commencement of employment be supported by new consideration.

(2) <u>Consideration - Benefits to the Employees</u>

135. Even were the Act deemed inapplicable to the 2002 Agreement, we would nevertheless find that new consideration supports the non-compete covenant in the 2002 Agreement.

136. VALIC has argued that the Pennsylvania rule requiring new consideration should not apply here because the non-compete in the 2002 Agreement is less restrictive than the non-compete in the 2001 Agreement. According to VALIC, because The Employees did not incur any greater restrictions under the 2002 Agreement, no "corresponding benefit" is required. <u>Maintenance Specialties</u>, 314 A.2d at 282.

137. Although logical, we must reject this argument because it is in conflict with controlling Pennsylvania precedent.

138. In <u>John G. Bryant Co., Inc. v. Sling Testing & Repair, Inc.</u>, 369 A.2d 1164, 1169 n.1 (Pa. 1977) the Pennsylvania Supreme Court required new consideration to support a non-compete covenant that was less restrictive than the non-compete in a prior contract.

139. Likewise, the Pennsylvania Superior Court applied the rule requiring new consideration to a second, less restrictive non-compete covenant in <u>Gordon Wahls Co. v. Linde</u>, 452 A.2d 4, 6 (Pa. Super. 1982).

140. Given that the Pennsylvania Supreme Court has spoken on this issue, and a more recent Pennsylvania Superior Court decision is in accord, we are not at liberty to reach a different conclusion.

141. The non-compete covenant in the 2002 Agreement was added to an existing employment relationship. Therefore, the 2002 Agreement must be supported by new consideration in order to be enforceable.

142. A reduction in the scope of a non-compete covenant can be considered, along with other benefits, in determining whether there is new consideration. Bryant, 369 A.2d at 1169 (consideration provided by reduction in the scope of non-compete, and restructuring of business relationship, to the benefit of employee); Linde, 452 A.2d at 6 (consideration provided by limitation on geographical scope of non-compete, increase in salary, notice of termination, and addition of disability benefits).

143. Benefits that are contingent, or that provide only the potential to realize financial gains or other benefits, can be considered in determining whether there is new consideration. Wainwright's Travel Service, Inc. v. Schmolk, 500 A.2d 476, 478 (Pa. Super. 1985) (change in ownership status, with the future potential to realize monetary gains, provided consideration); Linde, 452 A.2d at 6 (disability benefits and notice of termination, neither of which may ever be used by an employee, provided consideration).

144. In this case, The Employees received the following benefits when they signed the 2002 Agreement: a reduction in the number of protected companies with which they could not compete; removal of the prohibition on the solicitation of other employees; addition of their ability to file suit under the Agreement in a jurisdiction other than Harris County, Texas; removal of the provision requiring them to pay VALIC's attorneys fees in the event that judgment was entered against them in a matter involving enforcement of the 2002 Agreement; and addition of their right to request an arbitration action under the Agreement, which option was previously only available to VALIC.

145. Each of these items provided a benefit to The Employees and satisfies the new consideration requirement.

146. In fact, the value of several of these benefits is demonstrated in this case: Latuszewski asked Denise Alfieri to quit her job with VALIC to work for North Atlantic; The Employees exercised their option to request arbitration in this case; The Employees do not have to pay VALIC's attorneys fees, which are presumably quite substantial, even though judgment will be entered against them; and The Employees filed suit outside of Harris County, Texas, without having to

engage in protracted and expensive litigation over the proper forum.

147. In light of the fact that the 2002 Agreement does not impose any greater competitive restriction on The Employees than they were already subject to under the 2001 Agreement, the reduction in the scope of the non-compete covenant, combined with the other benefits listed above, provide sufficient new consideration to satisfy the requirement under Pennsylvania law that an employee receive a corresponding benefit when asked to sign a non-compete covenant after employment has begun.

(b)   Contract of Adhesion/Unconscionability

148. Although The Employees have submitted no proposed findings relating to this issue, they appeared to contend at trial that the 2002 Agreement should not be enforced because it was a contract of adhesion, and/or because it was unfair to the employees.

149. In finding the 2002 Agreement to be valid and enforceable, we reject The Employees' implied assertions that the 2002 Agreement is a contract of adhesion, or is otherwise unconscionable.

150. The Employees have provided no evidence to satisfy the standards under Pennsylvania law to invalidate the 2002

Agreement on the ground that it is a contract of adhesion.

151. Under Pennsylvania law, "an employment contract is not a contract of adhesion, even when an employee is told to 'sign or be terminated"' or merely because a party alleges that he entered into an agreement "which he would not have entered if his financial circumstances were more secure."  See Stebok v. American General Life and Accident Ins. Co., 715 F. Supp. 711, 714 (W.D. Pa. 1989), aff'd, 888 F.2d 1382 (3d Cir. 1989).

152. To invalidate a contract on the ground that it is an adhesion contract, a party must prove both a lack of meaningful choice about whether to accept the provision in question, and that the disputed provision was so one-sided as to be oppressive.  Stanley A. Klopp, Inc. v. John Deere Co., 510 F.Supp. 807, 811 (E.D. Pa. 1981), aff'd., 676 F.2d 688 (3d Cir. 1982); Koval v. Liberty Mut. Ins. Co., 531 A.2d 487, 491 (Pa. Super. 1987).

153. The Employees have made neither showing in this case.

154. First, the facts demonstrate that The Employees were invited to raise questions or issues regarding the terms of the 2002 Agreement with their supervisor.  No plaintiff did so.  Thus, The Employees' claims that

they had no choice but to accept the 2002 Agreement, as drafted, ring hollow. Assumptions that The Employees could not have challenged the provisions to which they now object are insufficient as a matter of proof.

155. Second, The Employees have made no showing that the terms of the 2002 Agreement were oppressive. Instead, The Employees claim that VALIC has no trade secrets or confidential information, argue that the contract violated rules of the securities industry, and contend that they were treated unfairly, in general, while in VALIC's employ. The Employees also allege that they were threatened with legal action, and personal and financial ruin, if they violated their contracts. These facts do not prove that any particular provision of the 2002 Agreement was oppressive or one-sided.

156. Upon independent review, we find that subsection a of the non-compete covenant, which is the only section sought to be enforced in this case, is reasonably and narrowly drawn, and is not unfair, one-sided, oppressive, or otherwise unconscionable. The subsection strikes a balance between protecting VALIC against a raid on their customer base by a former employee, while still allowing financial advisors to work in their chosen field and customers to

independently seek out a particular financial advisor's
continued assistance after he has left VALIC's employ.

157. Upon independent review, we find that none of the trade
secret or confidentiality provisions are unfair, one-
sided, oppressive, or otherwise unconscionable.  As the
court of appeals has already held, VALIC's customer
information qualifies as valid trade secrets,
warranting protection against unauthorized disclosure
and use.  The 2002 Agreement reasonable and fairly
proscribes the disclosure and use of trade secret and
other proprietary information.


### (c)   Waiver and Estoppel

158. Although The Employees have submitted no proposed
findings relating to these issues, they appeared to
contend at trial, and raised as a defense in their
answer, that the 2002 Agreement cannot be enforced
because VALIC waived its protections, or are estopped
from enforcing them.

159. In finding the 2002 Agreement to be valid and
enforceable, we reject The Employees' assertions that
VALIC waived the protections of, or is estopped from
enforcing, the 2002 Agreement.

160. Waiver is the act of intentionally relinquishing or

abandoning some known right, claim or privilege. <u>Brown v. City of Pittsburgh</u>, 186 A.2d 399, 401 (Pa. 1962).

161. Estoppel arises when one by his act or omission induces another to believe certain facts to exist and such other relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts. <u>Northwestern Nat'l Bank v. Commonwealth</u>, 27 A.2d 20, 23 (Pa. 1942).

162. The Employees have provided no evidence to make a showing of either waiver or estoppel under Pennsylvania law.

163. The Employees provided no evidence that any statements were made by VALIC leading them to reasonably believe that they were free to violate the 2002 Agreement. Casual office conversation does not bind the employer.

164. To the contrary, the evidence shows that VALIC reminded The Employees of their non-compete and confidentiality obligations under their employment contracts, and threatened The Employees with legal action were they to violate the same.

165. Although VALIC need not submit any evidence given The Employees' lack of proof, VALIC has submitted evidence showing that similar restrictive provisions have been enforced in other courts in recent years.

166. There is no basis for a finding that VALIC has waived,
or should be estopped from enforcing, the protections
of the 2002 Agreement.


(ii) <u>Reasonableness of the Non-Compete</u>

167. Although VALIC does not seek to enforce the non-compete
covenant by permanent injunction, because we must
determine whether The Employees were ever "wrongfully
enjoined" under the preliminary injunction, the
reasonableness of the non-compete is relevant.

168. Pennsylvania courts "permit the equitable enforcement
of post-employment restraints only where they are
incident to an employment relation between the parties
to the covenant, the restrictions are reasonably
necessary for the protection of the employer, and the
restrictions are reasonably limited in duration and
geographic extent." <u>Sidco Paper Co. v. Aaron</u>, 351 A.2d
250, 252 (Pa. 1976).

169. Non-compete covenants must protect an employer's
legitimate business interest, such as its "trade
secrets..., customer goodwill, and specialized training
and skills..." <u>Thermo-Guard, Inc. v. Cochran</u>, 596 A.2d
188, 193-94 (Pa. Super. 1991)

170. The covenant must be reasonable as to temporal and

geographical scope.  <u>Bryant</u>, 369 A.2d at 1169-70.

171. An employee has the burden of proving that a non-
     compete covenant is unreasonable.  <u>Bryant</u>, 369 A.2d at
     1169-70.

172. We find that the non-compete covenant in the 2002
     Agreement protects VALIC's legitimate business
     interests in its trade secrets and customer goodwill.

     a.   VALIC's customer information qualifies as trade
          secrets.  The Court of Appeals for the Third
          Circuit has affirmed the finding made on this
          issue in the preliminary injunction opinion.
          Further, as set forth in Findings 188-196 below,
          the customer information meets the standards of
          Pennsylvania law to qualify as a trade secret.

     b.   To the extent The Employees developed new business
          relationships, or fostered existing business
          relationships with customers in their territories,
          they did so as agents of, and for the benefit of,
          VALIC.  <u>Spring Steels, Inc. v. Molloy</u>, 162 A.2d
          370, 372 (Pa. 1960).  VALIC has a significant
          interest in its customer goodwill.

173. The non-compete covenant in the 2002 Agreement is
     reasonable in its temporal scope.  It is limited to one
     year, which we deem reasonable given the length of each

of The Employees' association with VALIC.

174. The non-compete covenant in the 2002 Agreement is
reasonable as to its geographic scope.  It is
specifically limited only to those customers in an
employee's assigned territory.  This protects VALIC
against a raid on its customer base by the employee
best equipped to do so, while still allowing employees
to act as financial advisors in the same geographic
area.

(iii) <u>Breach of the 2002 Agreement</u>

(a)   <u>Non-Compete Provisions</u>

175. Having found that the non-compete is supported by
adequate new consideration, and is reasonable, we
further find that each of The Employees breached the
2002 Agreement by inducing VALIC's customers to move
their money to North Atlantic.

176. Breach of the non-compete covenant caused harm to VALIC
because VALIC lost the profits associated with those
customers who transferred their assets to North
Atlantic.

177. We find that each of The Employees breached the
restriction against inducing customers to move their
assets to North Atlantic by targeting which customers

to contact while still employed by VALIC, and contacting them either before, or shortly after, their departure for the purpose of personally inviting them to move their assets to the new company.

178. We reject The Employees' contention that they did not induce the movement of any assets because they never coerced a customer to transfer his assets, never engaged in a "hard sell" of their new business venture, never provided customers with kickbacks or guaranteed returns, or because the decision to transfer the money was ultimately made by the customer, not The Employees. Rather, we find that given the close relationship of trust between The Employees and VALIC's customers, a personal invitation to join The Employees at their new company is sufficient to provide the persuasion and influence needed to constitute inducement under the law.

179. Enforcement of the non-compete covenant does not prevent The Employees from working in their chosen field, nor does it restrict customer choice.

   a.   The Employees could still earn a living by servicing any customer who they had not serviced in the year prior to leaving VALIC's employ.

   b.   The Employees could still service those former

customers who sought them out after they left
VALIC's employ.

c.     What The Employees could not do under the non-
compete, which is exactly what The Employees did
in this case, is formulate and execute a plan to
systematically move assets to a competing business
by targeting and personally contacting specific
customers who could move their assets without
penalty.

(b)   <u>Trade Secret/Confidentiality Provisions</u>

180. In addition to the non-compete covenant, the 2002
Agreement contained provisions restricting The
Employees' disclosure and use of VALIC's trade secrets,
and other confidential or proprietary information.

181. We find that each of The Employees breached the 2002
Agreement by disclosing and using VALIC's trade secret
and confidential information for his personal benefit,
and for the benefit of a competitor, that is, North
Atlantic.

182. The Employees removed, or kept, electronic, paper, or
mental versions of VALIC's customer information when
they left VALIC's employ.

183. The Employees used VALIC's trade secrets, both before

and after their termination, to target those customers
who would be asked to move their assets to North
Atlantic, and to facilitate the transfer of those
assets to North Atlantic.

184. Breach of these provisions caused harm to VALIC because
VALIC lost the profits associated with those customers
who transferred their assets to North Atlantic.


(c)  <u>Misappropriation of Trade Secrets</u>

185. To prevail on a claim for misappropriation of trade
secrets, VALIC must show: (1) the existence of a trade
secret; (2) that the trade secret is of value to the
employer and important in the conduct of its business;
(3) that the employer has the right to enjoin use of
the trade secret; and (4) that the trade secret was
communicated to the employee while in a position of
trust and confidence.  <u>Van Products Co. v. General
Welding & Fabricating Co.</u>, 213 A.2d 769, 775 (Pa.
1965).

186. According to the Court of Appeals for the Third
Circuit, "[t]he District Court thoroughly evaluated and
properly determined that VALIC satisfied these
elements" in its preliminary injunction opinion.

187. No new intervening facts or law were introduced at

trial, nor do we find any basis for finding that the
earlier decisions, by both this court, and the court of
appeals, were clearly erroneous, or resulted in a
manifest injustice.  Therefore, we reach the same
result, for the same reasons, as that reflected in this
court's preliminary injunction opinion.

188. We find that VALIC has proven that they own trade
secrets.

189. Trade secrets are defined as "any formula, pattern,
device, or compilation of information which is used in
one's business, and gives [one] an opportunity to
obtain an advantage over competitors who do not know or
use it."  <u>Felmlee v. Lockett</u>, 351 A.2d 273, 277 (Pa.
1976).

190. "Whether this information was embodied in written lists
or committed to memory is...of no significance; in
either case the data are entitled to protection."
<u>Morgan's Home Equip. Corp. v. Martucci</u>, 136 A.2d 838,
843 (Pa. 1957).

191. In determining whether information is a trade secret,
we must consider the extent to which the information is
known outside of the owner's business, the extent to
which it is known by employees and others involved in
the owner's business, the value of the information to

the owner and his competitors, the amount of effort or money expended in developing the information, and the ease or difficulty with which the information could be acquired or duplicated by others. <u>S.I. Handling Systems, Inc. v. Heisley</u>, 753 F.2d 1244, 1256 (3d Cir. 1985).

192. Upon consideration of each of these factors, we find that the customer information that The Employees took with them, in whatever form, qualifies as trade secrets. Such information includes customer lists, account balances, account activity, financial objectives, investment preferences, and transfer details, including penalties.

193. This customer information is not known outside of VALIC's business, is protected against unnecessary disclosure by VALIC, is costly to develop and maintain, difficult to recreate or duplicate, and is of paramount value to VALIC's business.

194. The presence of non-disclosure covenants in VALIC's employment contracts is further evidence of the confidential nature of the information. <u>Morgan's Home Equipment</u>, 136 A.2d at 843 n.5.

195. The Employees' claims that the information cannot be trade secrets because they helped develop it is

unavailing.  The information was developed while in VALIC's employ and is owned by VALIC.  <u>Morgan's Home Equip.</u>, 136 A.2d at 842; <u>see</u> <u>also</u> <u>Certified Laboratories of Texas, Inc. v. Rubinson</u>, 303 F.Supp. 1014, 1024-25 (E.D. Pa. 1969).

196. The Employees' claims that the information cannot be trade secrets because it is known to the customers themselves is also unavailing.  The fact that the same information can be gathered on any one customer by talking with the customer herself is irrelevant.  The value in VALIC's customer information is in the compilation, categorization, and organization of information on thousands of customers, combined with the ability to search and format it into a readily usable form.  This is what a competitor does not have and cannot easily recreate.  And this is exactly how The Employees used the information to target which customers to invite to move their assets to North Atlantic.

197. We find that the other elements of a misappropriation of trade secrets claim are met.

198. The customer information is of significant value to VALIC.  It is the foundation of their business.

199. VALIC has the right to sue to stop the unauthorized

disclosure of the information.

200. The customer information was communicated in confidence to The Employees, as evidenced by the confidentiality provisions in the employment contracts, and the security protections placed on VALIC's computer system.

201. The Employees used the customer information, without authorization, by compiling lists, including mental lists, of those customers who would be targeted for transfer. The Employees also used the information in preparing for and attending meetings with these pre-selected customers, and in executing the transfer of assets to North Atlantic.

202. Finally, The Employees' misuse of VALIC's trade secrets resulted in the loss of more than $10 million in assets under management, causing harm to VALIC.


(d) <u>Breach of Duty of Loyalty/Fiduciary Duty</u>

203. Employees have a fiduciary duty of loyalty to their employer. <u>Sylvester v. Beck</u>, 178 A.2d 755, 757 (Pa. 1962); <u>Kademenos v. Equitable Life Assurance Soc'y of U.S.</u>, 513 F.2d 1073, 1076-77 (3d Cir. 1975).

204. To prove a breach of fiduciary duty under Pennsylvania law, VALIC must demonstrate: (1) that The Employees negligently or intentionally failed to act in good

faith and solely for the benefit of VALIC in all matters for which he was employed; (2) VALIC suffered damages; and (3) The Employees' actions caused the harm. <u>Synthes (USA) v. Globus Medical, Inc.</u>, 2007 WL 2043184 at *10 (E.D. Pa. Jul. 12, 2007) (citing <u>Dinger v. Allfirst Fin., Inc.</u>, 82 Fed. Appx. 261, 265 (3d Cir. 2003)).

205. Although an employee may make certain arrangements to establish himself in a new business before leaving his current employer's employ, he may not, before termination of his employment, solicit customers for such rival business, use his employer's time or any trade secrets in making preparations to leave, or otherwise engage in conduct directly damaging his employer during the period of employment. <u>Spring Steels</u>, 162 A.2d at 375; <u>Reading Radio, Inc. v. Fink</u>, 833 A.2d 199, 211 (Pa. Super. 2003); <u>Midland-Ross Corp. v. Yokana</u>, 293 F.2d 411, 413 (3d Cir. 1961); <u>Oestreich v. Envtl. Inks & Coatings Corp.</u>, 1990 WL 210599, *6 (E.D. Pa. Dec. 17, 1990).

206. In this case, each of The Employees breached his duty of loyalty to VALIC by intentionally and negligently acting in bad faith and against VALIC's interest while still employed.

207. Each of The Employees engaged in at least one of the following wrongful activities while still in VALIC's employ: running reports from VALIC's computer system for purposes other than providing services to VALIC's customers on VALIC's behalf; having meetings with VALIC's customers to invite them to move their assets to North Atlantic; assembling data and files that would be of use in transferring assets to North Atlantic; forwarding electronic data from VALIC's computer system to North Atlantic, or personal, e-mail accounts regarding VALIC's customers; and creating a target book of business that would be moved to North Atlantic.

208. VALIC was harmed in that $10 million in assets under management were transferred to North Atlantic.

209. The Employees caused the harm by inducing the transfer of those assets.


(e)  Tortious Interference with Contract

210. The elements of a claim for tortious interference with existing and prospective contract are: (1) existence of a contract or prospective contract; (2) purposeful action specifically intended to harm the existing relationship or to prevent the relationship from occurring; (3) the absence of privilege or

justification; and (4) actual damages. <u>Strickland v. Univ. of Scranton</u>, 700 A.2d 979, 985 (Pa. Super. 1997).

211. VALIC has proven all elements of this cause of action.

212. VALIC had an existing contract with each of the customers who moved his money to North Atlantic.

213. The Employees acted with specific intent to harm that relationship by causing the customers to end their relationship with VALIC.

214. The Employees acted without any justification or privilege because they competed through wrongful means.

215. VALIC was harmed in that more than $10 million in assets under management were moved to North Atlantic.

(f)  <u>Payment Under the Injunction Bond</u>

216. A party injured by the issuance of an injunction that is later determined to be wrongful may seek to recover against the posted injunction bond.  <u>Sprint Communications Co. L.P. v. CAT Communications Int'l, Inc.</u>, 335 F.3d 235, 240 (3d Cir. 2003); <u>Instant Air Freight Co. v. C.F. Air Freight, Inc.</u>, 882 F.2d 797, 804 (3d Cir. 1989).

217. Under Rule 65(c), a party is wrongfully enjoined when it had a right all along to do what it was enjoined from doing.  <u>Global Naps, Inc. v. Verizon New England,</u>

489 F.3d 13, 22 (1st Cir. 2007) (collecting cases).

218. Recovery under the bond is triggered only after final judgment on the merits is entered in favor of the enjoined party.  Clark v. K-Mart Corp., 979 F.2d 965, 969 (3d Cir. 1992) (citing American Bible Soc'y v. Blount, 446 F.2d 588, 594-95 & n.12 (3d Cir. 1971)); see also Madison Shipping Corp. v. National Maritime Union, 204 F.Supp. 22, 23 (E.D. Pa. 1962) ("It is undoubtedly the general rule that there can be no recovery of damages caused by a preliminary injunction, even if the injunction is set aside, unless final judgment after trial is in favor of the party who has been enjoined.").

219. If a party can prove that he has been wrongfully enjoined, he may recover on the bond if he can also prove by competent evidence that he suffered damages that were proximately caused by the wrongful injunction.  Virginia Plastics Co. v. Biostim, Inc., 820 F.2d 76, 80-81 & n.6 (3d Cir. 1987).

220. If an enjoined party can prove that the injunction was sought in bad faith or maliciously he may collect damages in excess of the face amount of the injunction bond.  Global Naps, 489 F.3d at 21; Don Post Studios,

Inc. v. Cinema Secrets, Inc., 148 F.Supp.2d 572, 575
(E.D. Pa. 2001).

221. The Employees are not entitled to payment under the
     injunction bond because final judgment on the merits
     has not been entered in their favor.

222. Alternatively, we would not award The Employees payment
     under the injunction bond under the circumstances of
     this case.

223. Even though the Court of Appeals for the Third Circuit
     vacated the preliminary injunction, it did not find
     that the entire injunction was wrongfully entered.  The
     appellate court upheld that portion of the preliminary
     injunction that prohibited the use of trade secret
     information to solicit or service former VALIC
     customers.  The court of appeals simply questioned the
     validity of the injunction "to the extent" that it "can
     be read" to prevent The Employees from servicing former
     customers who approached The  Employees voluntarily,
     and provided The Employees with the account and
     investment information needed to service their
     accounts.

224. The Employees did not sufficiently prove that the one
     portion of the injunction that the court of appeals
     found to be potentially improper caused any damages to

them.

225. The Employees' expert evidence on damages does not
serve to prove that damages were caused by the one
potentially improper portion of the preliminary
injunction.

a. First, the damages expert includes in his damages
calculation losses incurred while the standstill
agreement was in place. The standstill agreement
was voluntarily entered into by The Employees,
before the preliminary injunction issued, and
before VALIC ever posted the injunction bond. It
would be improper, and illogical, to make an award
under the preliminary injunction bond based on
losses allegedly caused by the standstill
agreement. That The Employees might now be
dissatisfied with how long the standstill
agreement was in place is not relevant to proving
that damages were caused by the preliminary
injunction.

b. Second, the damages expert assumes that no
referrals could be accepted from former customers,
and awards substantial damages on that basis.
Under no reasonable reading of the preliminary
injunction were The Employees forbidden from

accepting referrals from former customers.

c.   Third, the damages expert does not acknowledge, or account for the fact that the court of appeals upheld the preliminary injunction to the extent that it proscribed the use of trade secrets to solicit and service former customers.  The damages calculation fails to acknowledge that The Employees were properly enjoined from using trade secrets in the exact manner that they used them, that is, to target former customers, to contact them, and to ask them to move their assets to North Atlantic.

d.   Finally, the damages expert bases his future lost profits projections on the amount of assets that The Employees moved to North Atlantic immediately after leaving VALIC's employ.  However, this methodology results in an artificial inflation of the damages amount.  The Employees moved $10 million in assets under management so quickly because they executed a plan to target specific customers for transfer.  The plan was largely successful and resulted in each plaintiff moving an amount of assets close to his pre-departure approximation.  The evidence shows that this

amount of business activity was unusual for The
Employees, resulting in commissions far in excess
of those earned during similar time frames in
prior years.  There is no evidence that The
Employees had any expectation of moving another
similarly large piece of business from VALIC to
North Atlantic, or of generating a similarly large
amount of new business from other sources.
Basing an award of future lost profits on the $10
million moved from VALIC as a result of executing
a preconceived plan is fundamentally flawed.

226. Although some of The Employees testified antidotally
about a few instances in which former customers
casually approached them for services, which would be
the only instance in which damages under the injunction
bond may be proper, no details were given on those
occurrences.  For instance, we have no information on
the type or size of the account that was lost in such
an instance, and the type of commission that would have
been paid on it.

227. In determining whether any damages were caused by the
one portion of the preliminary injunction that the
court of appeals found to be potentially improper, we
must also consider that we have now found subsection a

of the non-compete covenant to be enforceable. As
such, The Employees never had the right to induce, or
attempt to induce, VALIC's customers to move their
assets to North Atlantic.

228. Although the issue of exceeding the face amount of the
bond is moot given that no damages have been proven, we
find that there is no evidence that VALIC sought the
preliminary injunction in bad faith, or that its
counterclaims were malicious, frivolous, baseless or
unreasonable.

(g)  Relief

   (i)  Monetary Relief

229. VALIC is not seeking monetary damages based on revenue
lost due to The Employees' continued service of their
family members.

230. The present value of the revenue that VALIC would have
received from the accounts transferred by Latuszewski
is $329,850.00.

231. The present value of the revenue that VALIC would have
received from the accounts transferred by Bigham is
$94,632.00.

232. The present value of the revenue that VALIC would have
received from the accounts transferred by Rogan is

$157,478.00.

233. These losses are appropriately awarded to VALIC under any one of its counterclaims, whether breach of contract, misappropriation of trade secrets, breach of the duty of loyalty, or interference with contract.

234. We do not order the disgorgement of any profits that The Employees made through the transfer of the $10 million in assets under management.  Rather, The Employees' unjust enrichment has been taken into account in the lost profits award of nearly $600,000.00.

235. We do not order an award of punitive damages.  Although we certainly do not condone The Employees' actions, their conduct is not so outrageous to warrant punitive damages.

(ii) <u>Injunctive Relief</u>

236. The restrictions of the non-compete covenant and the confidential business information provisions in the 2002 Agreement have long since expired.  VALIC does not seek a permanent injunction based on those provisions.

237. VALIC does seek a permanent injunction under the trade secret provision of the 2002 Agreement, and the misappropriation of trade secrets counterclaim.

238. In Pennsylvania, an employee may be permanently enjoined from using or disclosing an employer's business information if the following requirements have been met: (1) the employer has succeeded on the merits of its claims; (2) the court's exercise of equity jurisdiction is proper; and (3) the balance of equities tips in favor of injunctive relief. <u>See</u> <u>The Hyman Companies v. Breeziest</u>, 119 F.Supp.2d 499, 503 (E.D. Pa. 2000).

239. Although VALIC has succeeded on the merits of its claims, the broad, and perpetual, injunctive relief requested is not warranted.

240. The court will enjoin The Employees from using any electronic or paper files, data, or lists taken from, or used while, in VALIC's employ.

241. The court will not permanently enjoin The Employees from contacting their former customers, on the assumption that such contact would constitute a use of VALIC's trade secrets. To do so, would, in effect, grant VALIC a perpetual non-compete covenant, for which it did not bargain, and of which it likely could not have obtained enforcement.

242. Moreover, we find that the passage of time has lessened the amount, and value, of customer information in The

Employees' memories, and has diluted the strength of the relationship between The Employee and the former customer.

243. On balance, and upon consideration of the equities, VALIC has been given several years of protection from The Employees' wrongful competition, as well as, monetary compensation for the damages caused by it. To award VALIC more, and limit The Employees' business dealings for all time, would do more than level the playing field, but would tip it substantially in VALIC's favor.


BY THE COURT,


s/Gary L. Lancaster, J.
Gary L. Lancaster,
United States District Judge


Dated:  December 18, 2007

cc:  All Counsel of Record